UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

LIVIA R.,

          Plaintiff,

    v.                              **DECISION AND ORDER**

                                      23-CV-1319S

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.
_____

      1.      Plaintiff Livia R.[1] brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final determination of the Commissioner of Social Security that denied her application for supplemental security income under Title XVI of the Act. (Docket No. 1.)  This Court has jurisdiction over this action under 42 U.S.C. § 405(g).

      2.      Plaintiff protectively filed her application with the Social Security Administration on October 27, 2020.  She alleged disability from that date due to major depressive disorder, borderline personality disorder, varicose veins of both lower extremities, obesity, post-traumatic stress disorder ("PTSD"), heart murmur, high blood pressure, seizures, heart palpitations, diabetes, traumatic brain injury, anxiety, and neck and back pain.  Her application was denied and she thereafter requested a hearing before an administrative law judge ("ALJ").

---

[1] In accordance with this Court's Standing Order of November 18, 2020, and consistent with guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, this Decision and Order will identify Plaintiff by first name and last initial.

3.      On October 31, 2022, ALJ Stephan Bell held a telephonic hearing at which Plaintiff represented by counsel testified as did Vocational Expert Susan Gaudet.  (R. [2] at 40-59.)  Plaintiff was 57 years old when she applied for benefits and had a high school education.  She did not have any past relevant work although reported employment within the prior fifteen years as a cashier, teller, medical receptionist, shipping and receiving clerk, and temporary laborer that did not qualify as substantial gainful activity.  (R. at 33.)

4.      The ALJ considered the case *de novo* and, on November 10, 2022, issued a written decision denying Plaintiff's applications for benefits.  After the Appeals Council denied Plaintiff's request to review the ALJ's decision, she filed the current action, challenging the Commissioner's final decision.[3]  (Docket No. 1.)

5.      Both parties moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket Nos. 9, 13.)  Plaintiff filed her Response on May 24, 2024.  (Docket No. 14.)  This Court then took the Motions under advisement without oral argument.  For the reasons that follow, Plaintiff's Motion will be denied and Defendant's Motion will be granted.

6.      A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error.  See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  Substantial evidence is that which amounts to

---

[2] Citations to the underlying administrative record are designated as "R."

[3] The ALJ's November 10, 2022, decision became the Commissioner's final decision on this matter when the Appeals Council denied Plaintiff's request for review.

"more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 26 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

7.      "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams *ex rel.* Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference and will not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

8.      The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled under the Act. See 20 C.F.R. § 416.920. The Supreme Court of the United States recognized the validity of this analysis in Bowen v. Yuckert, and it remains the proper approach for analyzing whether a claimant is disabled. 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).

9.      The five-step process is as follows:

>First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If [s]he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [s]he has the residual functional capacity to perform [her] past work.  Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (quotations in original); see also 20 C.F.R. § 416.920; Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

10.    Although the claimant has the burden of proof at the first four steps, the Commissioner has the burden of proof at the fifth and final step.  See Yuckert, 482 U.S. at 146 n.5.  The final step is divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering her physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920(f); see also Heckler v. Campbell, 461 U.S. 458, 460-61, 103 S. Ct. 1952, 76 L. Ed. 2d 66 (1983).

11.    The ALJ analyzed Plaintiff's claim for benefits under the process set forth above.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the October 27, 2020, application date.  (R. at 19.)  At Step Two, the ALJ

found that Plaintiff had the following severe impairments:  major depressive disorder, borderline personality disorder, varicose veins of both lower extremities, and obesity.  (R. at 19-21.)  At Step Three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that met or medically equaled any impairment(s) listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21.)

12.    Next, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform medium work but with the following nonexertional limitations.  The ALJ found that Plaintiff could lift, carry, push, and/or pull 50 pounds occasionally and 25 pounds frequently, while she could sit and walk for 6 hours in an 8-hour workday. Further, the ALJ noted that Plaintiff could perform simple, routine tasks and could make simple work-related decisions while occasionally interacting with supervisors, coworkers, and the public.  (R. at 24.)

13.    At Step Four, the ALJ found that Plaintiff had no past relevant work.  (R. at 33.)  At Step Five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  (R. at 33-34.)  The ALJ did so by posing hypotheticals to the Vocational Expert of a claimant sharing Plaintiff's age, education, work experience, and RFC.  The Expert opined that this hypothetical claimant could perform such representative jobs as a hand packager, store laborer, and industrial cleaner.  Accordingly, the ALJ found that Plaintiff was not disabled.  (Id.)

14.    For disability applications filed after March 27, 2017, Social Security regulations require that the agency consider the persuasiveness of medical opinions while not deferring or giving any specific evidentiary weight to any medical opinion.  See, e.g., 20 C.F.R. § 416.920c(a).  The Social Security Administration considers the supportability

and consistency of the opinions as the most important factors in assessing that opinion's persuasiveness.  Id. § 416.920c(c)(1), (2), (b)(2).  The ALJ must explain his approach with respect to supportability and consistency when considering a medical opinion. Melissa F. v. Comm'r, No. 1:20-CV-1363 (WBC), 2021 WL 3887256, at *3 (W.D.N.Y. Aug. 31, 2021) (citing 20 C.F.R. § 416.920c(b)).  The more consistent a medical opinion is with the rest of the evidence from other medical and nonmedical sources, the more persuasive that opinion would be.  20 C.F.R. § 416.920c(c)(2).  The more relevant the objective medical evidence and supporting explanations presented by the medical source in support of their opinion, the more persuasive that medical opinion would be.  Id. § 416.920c(c)(1).

15.    Plaintiff now opposes the ALJ's decision on two substantive grounds and a procedural objection.  Substantively, she argues that the ALJ erred because the physical RFC is not based on substantial evidence, seeking remand of this matter because she should have been deemed disabled from performing medium exertion work under the Medical-Vocational Grids due to her age.    Plaintiff next argues that the ALJ inappropriately evaluated the opinions of treating professionals and consultative psychologists in concluding that she had no mental impairments.  Procedurally, Plaintiff contends that the ALJ erroneously cited whole exhibits from the medical record precluding meaningful judicial review.

16.    For the reasons that follow, this Court rejects Plaintiff's procedural objection because the method the ALJ used in citing the evidence in record did not preclude judicial review.   On Plaintiff's substantive arguments, this Court finds that Plaintiff has not

established severe limitations from her treated fibroids or her leg pain.  Finally, this Court finds that the ALJ appropriately evaluated Plaintiff's mental health opinion evidence.

17.     First, this Court addresses Plaintiff's procedural objection.  See Ameer B. v. Acting Comm'r, No. 1:21-cv-01296 (JJM), 2023 WL 5198793, at *3 (W.D.N.Y. Aug. 14, 2023).  Plaintiff argues that citation to whole sections of the medical record precludes judicial review.

18.     In discussing Plaintiff's nonsevere physical impairments, the ALJ cited in their entirety eight exhibits from Plaintiff's medical records from 2013 to 2022.  From a record totaling 1,199 pages the ALJ cited 633 pages including 215 pages from Plaintiff's March 26, 2021, hysterectomy.  The ALJ cited these records to discuss Plaintiff's various conditions including uterine fibroids and right ovarian cysts, noting that Plaintiff's March 2021 hysterectomy resolved her symptoms and showing that Plaintiff had normal and generally unremarkable examination findings.  (R. at 21, citing R. at 357-71, 472-534, 557-90, 598-663, 674-1029, 1051-1141.)

19.     This Court acknowledges that in some circumstances the ALJ's citation to entire exhibits alone is insufficient to ensure that the ALJ considered all the evidence contained therein.  Ameer B., 2023 WL 5198793, at *3 (citing Loni S. v. Comm'r, No. 3:22-CV-805 (CFH), 2023 WL 4195887, at *16 n.11 (N.D.N.Y. June 27, 2023)).  In Ameer B., the ALJ either cited entire exhibits or failed to make any citation at all.  That court concluded that this manner of citation to the record made "it difficult to determine what evidence [the ALJ] considered, especially in his discussions of the supportability and consistency of the opinion evidence with other evidence in the record."  Id.

20.     Moreover, this Court's otherwise deferential standard of review of the ALJ's decision does not require this Court to "scour the record for supportive evidence or rack our brains for the reasons to uphold the ALJ's decision."  Moon v. Colvin, 763 F.3d 718, 721 (7th Cir. 2014); see Angela G. v. Comm'r, No. 19-CV-6846-MJR, 2020 WL 7706568, at *6 n.4 (W.D.N.Y. Dec. 29, 2020) (quoting Moon, 763 F.3d at 721).  "Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination."  Moon, 763 F.3d at 721.

21.     On the other hand, there is no requirement that the ALJ specifically cite pages in the medical record.  Elly D. v. Comm'r, 726 F. Supp. 3d 46, 56 (D. Conn. 2024).  Moreover, as the Second Circuit held, "an ALJ does not have to state on the record every reason justifying a decision."  Brault v. Social Sec. Admin., 683 F.3d 443, 448 (2d Cir. 2012).  Nor is the ALJ "required to discuss every piece of evidence submitted."  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); see Brault, 683 F.3d at 448.  Furthermore, the ALJ's "failure to cite specific evidence does not indicate that such evidence was not considered."  Brault, 683 F.3d at 448; see Black, 143 F.3d at 386.  Moreover, general unremarkable exam results can be referenced from whole exhibits in the treatment record.  See Angela G., 2020 WL 7706568, at *6.

22.     In this case, this Court concludes that the record as cited by the ALJ can be reviewed to find support for the ALJ's findings, and this Court was not hindered by the volume of the records cited.  This Court did not need to scour this record to find supportive evidence as shown below in discussing Plaintiff's substantive objections to the ALJ's decision.  Therefore, Plaintiff's procedural objection to the manner the ALJ cited the record to justify the RFC is rejected.

23.    On her substantive objections to the ALJ's consideration of her medical condition, Plaintiff complains that the ALJ glossed over her symptoms caused by uterine fibroids leading to an erroneous physical RFC.  Supporting her argument, Plaintiff notes persistent sharp pain and continuous urine leakage following her hysterectomy.  (R. at 641, 1102.)  Plaintiff further argues that the ALJ failed to account for her occasional bilateral leg pain, numbness, and tingling in her feet in the RFC.

24.    This Court disagrees.  By referencing the medical record, the ALJ appropriately concluded that Plaintiff's claimed medical impairments caused by her fibroids and leg pain were not severe.  The cumulative evidence from the record cited by the ALJ provides substantial evidence for his assessment of these nonsevere physical impairments.  Specifically, the record demonstrates that Plaintiff's hysterectomy resolved her uterine fibroids.  Further, Plaintiff denied suffering physical symptoms from her leg pain, maintained a normal gait, and used Ibuprofen to relieve her occasional complaints stemming from her leg pain.  This evidence further supports the ALJ's conclusion to not include limitations arising from these ailments in the RFC.  (See R. at 21, 26.)

25.    Considering treatment of Plaintiff's fibroids, her medical record includes complaints leading to her March 26, 2021, hysterectomy and the surgery itself.  (R. at 583-85, 601-05, 652, 734, 737.)  Plaintiff sought treatment at Neighborhood Health Center-Mattina (hereinafter "NHC-Mattina") from January 2021 through September 2022 for uterine fibroids, diabetes, and epigastric pain.  (R. at 1062-1141.)

26.    Henry Reyes, M.D., performed Plaintiff's hysterectomy.  After this surgery, on March 29, 2021, Dr. Reyes recommended that Plaintiff refrain from pushing, pulling, and lifting anything greater than five pounds for eight weeks post-surgery or until May 21,

2021.  (R. at 28, 583, 661.)  This eight-week recovery period is far less than the continuous period of at least twelve months that would constitute a disability under Social Security regulations.  See 20 C.F.R. § 416.905(a).

27.    Citing Dr. Reyes' observations, the ALJ found them only partially persuasive because they constituted a temporary restriction and the absence of evidence of limitations after May 21, 2021.  (R. at 28; cf. R. at 661.)

28.    During the eight-week recovery period following the hysterectomy, staff at NHC-Mattina examined Plaintiff.  The first appointment was on April 29, 2021, with Amanda Ode, NP, where Plaintiff complained of slight back pain with post-surgery abdominal pain that was not eased by over-the-counter medication and stated that she was doing well even when complained of leaking urine and sharp abdominal pain.  (R. at 639, 641, 1102, 1104.)  NP Ode noted that Plaintiff had a follow up appointment with Dr. Reyes on May 8, 2021, and prescribed increased physical activity of 30 minutes of exercise three times a week.  (R. at 643-44, 1106.)

29.    On May 12, 2021, Anne Marie Davis, D.O., of NHC-Mattina examined Plaintiff, who complained of having back pain.  (R. at 1099.)  Plaintiff then reported that she had no post operative issues.  (R. at 1100.)  Dr. Davis advised that Plaintiff should not lift more than 10 pounds.  (R. at 1101.)

30.    After the post-operative rehabilitation period, Plaintiff no longer complained of uterine fibroids.  For example, on August 26, 2021, Janette Evans, NP, of NHC-Mattina examined Plaintiff without any complaint about uterine fibroids or the aftereffects of the hysterectomy.  (R. 1089-93; see also R. at 21.)  Furthermore, in February and March 2022, NP Ode treated Plaintiff for her complaints of abdominal pain in her

epigastrium above the pit of her stomach, a condition unrelated to her fibroids.  (R. at 1070, 1074.)  See Clayton L. Thomas, ed., Taber's Cyclopedic Medical Dictionary 608 (16th ill. ed. 1989).

31.    On March 2, 2022, NP Ode examined Plaintiff for an employability assessment and found that Plaintiff had a permanent impairment but had no limitations for walking, standing, lifting, carrying, pushing, pulling, bending, seeing, hearing, speaking, using her hands, or climbing.  (R. at 1031-32; see R. at 31.)  NP Ode diagnosed Plaintiff with physical ailments of Type II diabetes, hypertension, and hyperthyroidism, but did not note any limitations due to Plaintiff's fibroids or hysterectomy.  (R. at 1032, 1034; see also R. at 31.)

32.    In an October 27, 2022, evaluation, NP Ode noted that Plaintiff did not complain of any pain.  (R. at 1186.)  Nevertheless, she found that Plaintiff could only lift or carry less than 10 pounds frequently or occasionally, sit for an hour, stand for 15 minutes, and walk 10 blocks at one time, and able to sit for a total of 2 hours and stand or walk for less than a total 2 hours during an 8-hour workday.  (R. at 1187-88; see R. at 32.)  NP Ode opined, however, that Plaintiff did not need to shift positions or take unscheduled breaks.  (R. at 1188; see R. at 32.)

33.    The ALJ found that these physical impairment findings were consistent with Plaintiff's normal physical examinations and that the hysterectomy resolved her fibroid symptoms.  (R. at 21, 31, citing R. at 472-534, 587-90, 598-663, 770-99, 1118-41.)

34.    The ALJ concluded that the fibroid limitations found in NP Ode's medical opinions were not consistent with Plaintiff's lack of persistent complaints and thus deemed nonsevere Plaintiff's fibroid impairments because of the absence of complaints and that

her examinations were unremarkable.  (R. at 21, 32, citing R. at 357-71, 472-534, 546-53, 587-90, 598-663, 674-1029, 1051-1141.)  The ALJ noted that no further aggressive treatment was recommended or anticipated for this condition.  Concluding that the impairment should be amenable to proper control by adherence to recommended medical management, the ALJ found that the uterine fibroids were nonsevere.  (R. at 21.)

35.    This Court finds that the record supports the ALJ's severity assessment of Plaintiff's uterine fibroids.  The record clearly shows Plaintiff's condition before her hysterectomy, during that procedure, the recovery therefrom, and her improvement thereafter.  This Court finds that Plaintiff merely had lifting restrictions immediately following her May 2021 hysterectomy but not thereafter because Plaintiff ceased complaining about uterine fibroids after August 2021.  Plaintiff thus has not established limitations from this treated condition after May 2021 that would preclude performing medium work.

36.    As for Plaintiff's claimed severe impairment caused by leg pain, Plaintiff relies on the opinion of consultative examiner, Nikita Dave, M.D., who examined Plaintiff on March 11, 2021.  (R. at 546.)  During the examination, Plaintiff complained of a history of low back pain since her 1998 motor vehicle accident which caused her pain while standing, walking, bending, or lying down.  (R. at 547.)

37.    Dr. Dave found that Plaintiff's lumbar spine range of motion had declined. During this examination, Plaintiff became "quite argumentative" during tenderness palpation, stating initially that she had some diffuse tender points along the lumbar spine. But while distracted and reexamined, Plaintiff did not wince or indicate any tenderness on deeper palpation.  (R. at 548-49.)

12

38.    From this limited examination Dr. Dave noted that Plaintiff had full range of motion in her hips, knees, and ankles and found no cyanosis, clubbing, edema, or muscle atrophy in her extremities.  (R. at 549, 550.)

39.    Diagnosing a fair prognosis, Dr. Dave opined that Plaintiff had mild to moderate limitations for repetitive bending, prolonged standing, heavy lifting, or carrying due to her lumbar spine.  (R. at 550.)  Dr. Dave, however, did not diagnose any impairment stemming from Plaintiff's leg pain.  (Cf. R. at 549-50.)

40.    The ALJ did not find this opinion persuasive because it was based on a single examination, did not define what was meant by a "mild to moderate" limitation, and did not provide specific functional limitations.  Furthermore, the ALJ deemed Dr. Dave's opinion inconsistent "with the medical records showing few persistent complaints other than occasional leg pain and numbness and tingling in [Plaintiff's] feet and normal physical examinations other than varicose veins and an obese body habitus."  (R. at 26, 28.)

41.    The ALJ also observed that Plaintiff's treatment examinations revealed that she had a normal gait and station and that she did not require use of an assistive device when walking.  The only pain medication noted for Plaintiff was Ibuprofen as needed.  (R. at 26.)  Her primary care physician at NHC-Mattina repeatedly recommended regular aerobic exercise that Plaintiff acknowledged not performing.  (R. at 26, 1068, 1078, 1087, 1093, 1116, 1121, 1126.)

42.    Based on the medical record, this Court finds that the ALJ appropriately assessed Dr. Dave's opinion on Plaintiff's leg pain concluding that there was no basis for the limitations stated therein.

43.     In Plaintiff's twelve encounters at NHC-Mattina during her post-hysterectomy rehabilitation Plaintiff never mentioned her leg pain or history of that pain. This Court observes that the medical record revealed few complaints about Plaintiff's leg or lumbar pain and showed no restrictions to employment arising therefrom.  For instance, during the May 8, 2021, appointment, NP Ode did not include a review of Plaintiff's musculoskeletal system.   During Plaintiff's other appointments NP Ode or other staff noted the absence of back or leg pain when describing Plaintiff's musculoskeletal system. Plaintiff also did not mention any back, joint, or calf pain and NP Ode did not observe such pain during Plaintiff's April 29, 2021, appointment.  (R. at 1090, 1119, 1125, 1131.)

44.     Dr. Dave's own examination finding also did not reveal that Plaintiff had tenderness during a distracted palpation of her back while she retained full range of motion in her lower extremities and had otherwise normal examination findings.  (See R. at 548-50.)

45.     Therefore, this Court rejects Plaintiff's objections to the ALJ's severity consideration of any limitations arising from her leg pain.

46.     Finally, Plaintiff faults the ALJ's evaluation of mental health opinions, arguing that the ALJ inappropriately rejected the opinions of consultative psychologist Susan Santarpia, Ph.D., and treating NP Ode evaluating her PTSD.  She argues that the ALJ's finding was internally inconsistent because he did not adopt the otherwise consistent opinions of Dr. Santarpia and NP Ode.  (See R. at 1033, 1191-92.)

47.     Plaintiff testified that she suffered from PTSD after being raped at the age of 12 and from later witnessing the death of her best friend.  (R. at 44-45.)  Plaintiff also testified she had a physically abusive boyfriend who assaulted her and threatened to kill

her.  She became afraid of people, thinking that they would attack her.  After having been in three automobile accidents, Plaintiff had recurring dreams and visions of automobile accidents.  (R. at 45-46.)  Plaintiff testified that, to avoid shopping, she arranged for her adult daughters to order food and have goods delivered.  (R. at 46.)

48.    Dr. Santarpia examined Plaintiff on March 11, 2021, when Plaintiff reported suffering PTSD from being raped.  Plaintiff discussed her psychiatric hospitalization at Erie County Medical Center ("ECMC") and later outpatient treatment and counseling.  (R. at 541.)

49.    Dr. Santarpia diagnosed Plaintiff with major depressive disorder and PTSD.  (R. at 544.)  She found that Plaintiff appeared able to understand, remember, and apply simple and complex directions and maintain personal hygiene and appropriate attire.  (R. at 543; see R. at 30.)  Dr. Santarpia, however, found that Plaintiff had moderate or at times marked limitations in using reason and judgment to make work-related decisions, interacting adequately with supervisors, coworkers, and the public, sustaining concentration and performing a task at a consistent pace, controlling behavior, maintaining well-being, and taking appropriate precautions from hazards.  Dr. Santarpia noted that Plaintiff's difficulties were caused by her pending hysterectomy.  (R. at 543-44; see R. at 30.)  Dr. Santarpia found that Plaintiff's evaluation to be consistent with psychiatric problems that, until better treated and stabilized, would significantly interfere with Plaintiff's ability to function.  (R. at 544; see R. at 30.)

50.    In rendering her opinion, Dr. Santarpia reviewed and agreed with Plaintiff's treatment record and the diagnosis made in the consultative examination of Christine Ransom, Ph.D., on October 17, 2019.

51.     Dr. Ransom found that Plaintiff's PTSD then was mild based on her hospitalization at ECMC for psychiatric care followed by outpatient treatment and counseling.  (R. at 541, 544; see R. at 30, 372, 375.)  Dr. Ransom opined that Plaintiff had mild difficulty understanding, remembering, and applying complex directions and instructions, sustaining concentration to perform tasks at a consistent pace, and sustaining an ordinary routine and regular attendance at work.  Further, Dr. Ransom noted that Plaintiff could regulate emotions, control behavior, and maintain her well-being. Dr. Ransom found that Plaintiff had no limitation in understanding, remembering and applying simple directions, using judgment and reasoning to make work related decisions, interact with supervisors, coworkers, and the public, maintain personal hygiene, and be aware of normal hazards and take precautions.  (R. at 374-75; see R. at 30.)  Dr. Ransom found that Plaintiff's areas of difficulty were secondary to her PTSD which was then mild. (R. at 375.)  She concluded that the results of the evaluation appeared to be consistent with a mild psychiatric condition that did not interfere with Plaintiff's ability to function.  (R. at 375; see R. at 30.)

52.     Meanwhile, in her March 2, 2022, employability survey, NP Ode diagnosed Plaintiff with schizophrenia and insomnia.  (R. at 1032-34; see R. at 31.)  NP Ode found that Plaintiff had moderate limitations with appropriate interaction with others and maintenance of socially appropriate behavior without exhibiting behavior extremes.  (R. at 1033.)

53.     In a second employment survey dated October 27, 2022, NP Ode repeated Plaintiff's schizophrenia diagnosis but noted that it was controlled with medication.  (R. at 1186.)   NP Ode found that Plaintiff was precluded from performing in regular work

settings, working in coordination with or proximity to others without being unduly distracted, and completing a normal workday and workweek without interruptions from psychologically based symptoms.  NP Ode stated that Plaintiff could not perform at a consistent pace without an unreasonable number of rest periods and travel to unfamiliar places or use public transportation, and deal with normal work stress.  NP Ode also observed that Plaintiff was precluded from performing other mental abilities and aptitudes for more than 20% of a workday, such as aspects of understanding and memory, social interaction, and adaption.  (R. at 1191-92.)

54.    The ALJ considered the opinions of Drs. Ransom and Santarpia as well as NP Ode's findings.  (R. at 30-32.)

55.    He found partially persuasive Dr. Ransom's opinion because of its consistency with Plaintiff's generally normal mental status examinations albeit not fully addressing her subjective complaints although Dr. Ransom rendered her opinion based on a single examination and thus lacked a longitudinal view of Plaintiff's impairments or functional limitations.  (R. at 30; cf. R. at 357-534, 541-45 (Dr. Santarpia), 598-644, 674-1174.)

56.    The ALJ found Dr. Santarpia's opinion not persuasive for its inconsistency with Plaintiff's other subjective complaints after her onset date and her generally normal mental status examination results despite her opinion being consistent with Plaintiff's stated subjective complaints at her examination.  (R. at 30; cf. R. at 357-534, 541-45, 598-644, 674-1174.)

57.    The ALJ then found not very persuasive NP Ode's mental health limitation findings.  (R. at 31-32.)  On the one hand, the ALJ noted that NP Ode's assessment was

consistent with Plaintiff's subjective complaints but that assessment was not consistent with Plaintiff's generally normal mental status examinations and her reported activities. (R. at 31, 32; see R. at 373-75, 542-44, 641, 1175-79.)  The ALJ noted that NP Ode had examined Plaintiff but did not find that she suffered from anxiety or depression.  (R. at 31, 641.)

58.    This Court finds that the ALJ correctly assessed the consistency of these opinions consistent with 20 C.F.R. § 416.920c(c)(2) by comparing the opinion with evidence from other sources, medical or nonmedical, not just the opinion from another expert.  Social Security regulations measure consistency not merely by comparing two opinions.  Consistency of an opinion is based on evidence "from other medical sources and nonmedical sources."  20 C.F.R. § 416.920c(c)(2).  "Consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record."  Vellone on behalf of Vellone v. Saul, No. 20 Civ. 261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (emphasis added), adopted, 2021 WL 2801138 (S.D.N.Y. July 6, 2021); see Aaron M.O. v. Comm'r, No. 23-CV-623-A, 2024 WL 1621535, at *6 (W.D.N.Y. Apr. 15, 2024).  As another court noted, "the consistency factor does not measure whether a medical opinion is consistent with a single other medical opinion—it measures whether the medical opinion is consistent with all medical and nonmedical evidence in a claim."  Darla W. v. Comm'r, No. 5:20-cv-1085 (TWD), 2021 WL 5903286, at *9 (N.D.N.Y. Dec. 14, 2021) (emphasis in original).  The comparison thus is not restricted to looking at two sources.

59.    The ALJ is "not required to specifically assess the consistency between [two] opinions as long as he considered their consistency with the record as a whole."

David C. v. Comm'r, No. 1:22-CV-00965 EAW, 2024 WL 376598, at *4 (W.D.N.Y. Feb. 1, 2024).

60.    The ALJ here met his burden by articulating consideration of the medical opinion and how persuasive it was and by comparing it with the medical evidence as a whole and not merely with a particular opinion.  See id.  (See R. at 28-32.)

61.    Plaintiff instead wanted the ALJ to assess these mental health opinions solely based on their internal consistency and find persuasive the limitations stated in selected opinions.  This Court disagrees; the test for evaluating any psychological opinion is their consistency with the entire record.  Darla W., 2021 WL 5903286, at *9; David C., 2024 WL 376598, at *4.  Furthermore, the ALJ had the prerogative to resolve conflicts in the evidence.  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).

62.    The ALJ considered assessing the opinions Dr. Santarpia and NP Ode.  The ALJ found either unpersuasive or not very persuasive NP Ode's and Dr. Santarpia's opinions.  (R. at 30-32.)  On one hand, the ALJ found that NP Ode's March 2022 mental assessment was consistent with Plaintiff's subjective complaints but not with her generally normal mental status examinations or her reported activities.  (R. at 31; see R. at 312-18, 357-534, 544-53, 598-644, 674-1174.)  Furthermore, the ALJ weighed the consistency of NP Ode's October 27, 2022, mental assessment with Plaintiff's normal mental status examinations and her reported activities.  (R. at 31-32; see R. at  312-18, 357-534, 544-53, 598-644, 674-1174.)

63.    As for Dr. Santarpia's opinion, the ALJ found it consistent with Plaintiff's subjective complaints that she made during her examination but not with her subjective complaints as a whole and her generally normal mental status examinations.  (R. at 30.)

64.    This Court determines that the ALJ's finding was proper because Dr. Santarpia's medical source statement also differed from Dr. Ransom's statement as to Plaintiff's difficulty in understanding complex directions and instructions.  Dr. Ransom observed that Plaintiff had mild difficulty in this domain while Dr. Santarpia concluded that Plaintiff was able to understand simple and complex directions and instructions.  (Compare R. at 374 with R. at 543; see also R. at 30.)  But both psychologists found that Plaintiff's psychiatric problems were either mild or would "significantly interfere" with her ability to function if not stabilized and treated.  (R. at 375, 544.)  The ALJ properly assessed the persuasiveness of these opinions because they show mild, but treatable, impairments due to Plaintiff's PTSD and other psychiatric problems.  (R. at 30.)

65.    Accordingly, this Court concludes that in exercising his discretion the ALJ properly assessed these opinions and found any psychological limitations from Plaintiff's PTSD.  See Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009).  The ALJ assessed these opinions on the same grounds and rested on Plaintiff's subjective complaints and her otherwise normal mental status examinations.  (R. at 30, 32, citing R. at 357-534, 598-644, 674-1174.)  By considering the entire record rather than just a comparison of two opinions from that record, the ALJ thus complied with 20 C.F.R. § 416.920c(c)(2).

66.    Thus, this Court concludes that the ALJ appropriately considered the medical record in evaluating the consistency of psychological opinions with evidence from other sources.

67.    Accordingly, having reviewed the ALJ's decision and considered Plaintiff's arguments, this Court finds that the ALJ appropriately evaluated and referenced the medical and psychological evidence.  The manner and extent of the record cited in the

ALJ's decision did not preclude judicial review. Furthermore, the ALJ properly assessed the psychological opinions under the applicable Social Security regulations by considering their respective consistency with the medical record as a whole and not merely comparing the internal consistency of any two opinions.

IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 9) is DENIED.

FURTHER, that Defendant's Motion for Judgment on the Pleadings (Docket No. 13) is GRANTED.

FURTHER, that the Clerk of Court is directed to CLOSE this case.

SO ORDERED.

Dated:      March 27, 2025
            Buffalo, New York

                              s/William M. Skretny
                             WILLIAM M. SKRETNY
                          United States District Judge